11 So.2d 874

**BROWN v. STATE.**

l. Div. 435.

Court of Appeals of Alabama.

Jan. 19, 1943.

Rehearing Denied Feb. 2, 1943.

Bart B. Chamberlain, Jr., of Mobile, for appellant.

W. N. McQueen, Atty. Gen., and Walter W. Flowers, Asst. Atty. Gen, for the State.

BRICKEN, Presiding Judge.

All the property described in the indictment without dispute had recently been stolen, from the alleged injured parties, and on the night of the larceny, or very early the next morning, was admittedly found on the premises of appellant stacked up in his garage a short distance from his living quarters and place of business. As shown by the testimony it consisted of eight doors, of the value of $3 each, and about sixteen pieces of plywood of the value of $2 per piece. As stated, all of this property was identified as the property of McPhillips Manufacturing Company, a partnership, as alleged; and the testimony without conflict disclosed this identical property was stolen from the warehouse of said company on the Bay Point in Mobile, Alabama. Upon the trial of this case in the court below it was developed that two negro men, Jesse Jackson, and Albert Williams, had been arrested, but not yet tried, for the actual larceny of property involved in this prosecution. State Witness Druhan, one of the partners in the injured co-partnership, testified among other things:

"My name is J. R. Druhan and I am connected with the McPhillips Maufacturing Company, which is a partnership. The McPhillips Manufacturing Company is operating a manufacturing business on the Bay Front here in Mobile, Mobile County, Alabama. In connection with that business we have a store house where doors, sashes and things of that kind are kept. During the month of March of this year some personal property was stolen from that store house you asked me about. It consisted of some doors, eight doors. These doors are worth approximately three dollars each. There was also some ply-

wood, about sixteen pieces of plywood which is worth two dollars a piece. I have seen all these articles again since they were stolen. I saw them out at the Prichard Police. The plywood and the doors I saw out there were the property of the McPhillips Manufacturing Company, and of the value I have just described. They were stolen from our storehouse on March 21, I think. It was some time in the latter part of March of this year.

"I know Jesse Jackson. He has been working for us several years. The other darkey who was arrested in this affair, other than the defendant, was named Albert Williams. He had been working for us too. They both served as relief watchmen on Sunday and clean up men, clean up the mill and clean up the establishment. They were watching our goods down there. I do not know the defendant. He was not a clean up man down there. These two men were not authorized by me or any one in authority to take those doors or plywood or any other property out of there. All I know is those articles were stolen and they were the property of the McPhillips Manufacturing Company and I saw them out at Prichard. I saw them the next morning after they were stolen. I did not give this defendant any authority to receive it for me, and he did not tell me he had received it."

Neither of the parties charged with the actual larceny was introduced as a witness. The undisputed testimony does show, however, on the morning after the doors and pieces of plywood had been stolen, and, as before stated, placed in appellant's garage near his home, both of these men, Jesse Jackson and Albert Williams, were present in the defendant's place of business and were both arrested there about 9 o'clock on the morning of March 21, 1942, by two officers of the City of Prichard who put them in jail.

It developed upon the trial of this case that at the time of the above stated occurrence the defendant was making improvements upon his building, that is to say, the building wherein he was living at the time, and also running a restaurant and a beer parlor, in making such improvements was using the same kind of doors and plywood as was stacked in his nearby garage.

E. C. Anderson, a witness for the State, testified, among other things, as follows: "I am a police officer of the City of Prichard and I was a witness before the Grand Jury of this County in May of this year. I did not make the arrest in this case, but I began the investigation of it. The first I knew of it was about eleven-thirty on the 20th of March, 1942. Officer Lister and myself were patrolling and we passed by Brown's place. It was at night and I noticed two colored people in his garage, and we passed on by figuring they were after the tires on his car, and we passed on by and circled the block and cut the lights out on the car and parked by the school and watched the garage a while, and nothing happened, so we passed back by the garage and there were some wood, pieces of wood, laying in the garage about that long, and we let it go for a while; we got a call back to the station, and we were gone then until about two o'clock, and we came back over there around two o'clock, and the stuff was plywood and doors and was stacked in Brown's garage. It was not stacked in there when we first went in there. We waited out there a while to see if any more was going to come there or that disappear; we didn't know exactly what was going on, and so we fooled around there until about four o'clock in the morning and nothing never happened around there, and so we went to wake him up to find out about it, and when I went around to the back to wake him up he was already up, and I asked him about it and he said he didn't know nothing about it being out there. It was about four-thirty when we went to wake him up, and he was already up and said he did not know anything about it. We talked to him about it and he didn't know anything about it and didn't understand why it was out there, and he promised if any one came there to call for it he would notify us, and we knocked off at six o'clock and we turned the case over to Officers Dixon and Blake. He was engaged in some building at that time. He was building another story on to his building there. We went upstairs and examined the material used in there and there was quite a bit of plywood and we found several pieces with this stamp on it in his building that was in his garage. These pieces of plywood we found down in the garage were about four by seven or eight. The place he was building was under construction then and the plywood that had been used was new plywood."

And on cross-examination this witness testified: "I did not arrest two men later

on the same morning at his place. Dixon and Blake made the arrest. When we went around to this man's house he was up. We knocked on the door and he came to the door. As soon as we knocked he asked who it was. It was his sleeping room that we knocked at. He had his clothes on when he came to the door. He had on his pants and shirt, but I won't say about his shoes; I won't say he had his shoes on, I won't say positively; I don't think he had them on."

On redirect examination he stated: "His sleeping quarters was about as far from the place where this lumber and doors was found as it is to the back of the room. The plywood had not been used in the garage, it was in his house, in his sleeping quarters and cafe."

The second count of the indictment upon which defendant was tried and convicted reads as follows: "2. The Grand Jury of said County further charge that, before the finding of this indictment, Miles Brown whose name is to the Grand Jury otherwise unknown, did buy, receive, conceal or aid in concealing 8 doors of the value of $3.00 each and twenty sheets of plywood, of the value of $2.00 each, the personal property of McPhillips Manufacturing Company, a copartnership composed of H. Manning McPhillips, Hilda McPhillips, and J. R. Druhan, knowing that said property was stolen from a storehouse and not having the intent to restore it to the owner, against the peace and dignity of the State of Alabama."

The trial judge delivered a short, succinct and correct oral charge to the jury. Pertinent here, the court said: "Grand larceny is where a person feloniously takes or carries away the property of another, and under the first count you must be satisfied, and each of you, beyond all reasonable doubt from the evidence on the stand of the truthfulness of the material allegations of the first count, that he feloniously took this property, or that he aided, abetted or conspired in the taking of it, in which event he would be as guilty as if he actually went out there and took this property. Under the second count, you and each of you, must be satisfied from the evidence on the stand that he concealed, kept the property or purchased the same, knowing the same to have been stolen. Under the law if he was in possession of the property, and that is a matter for you to determine from the evidence on the stand; the evidence here is that it was in his garage and other evidence that he knew nothing of it; it is for you to determine if he was in possession of it. If you do determine that he was in possession of it, it becomes his duty to give a reasonable explanation of his possession of it. Unless he gives a reasonable explanation of it, then he doesn't meet the burden placed on him; if he does give, in your judgment, a reasonable explanation of it, provided you find he was in possession, then it is your duty to take the evidence otherwise from the stand to determine whether or not the defendant is guilty beyond all reasonable doubt. That is the law in the case. You are the sole judges of the evidence. The first issue is did he steal this property, or aid or abet or conspire to do so, and the second is if he did not do that, did he come into possession of this property knowing the same to be stolen; that is for you to determine from the evidence in the case."

It is stated in brief by earnest counsel for appellant, but one substantial question is to be decided by this court, and that is, whether or not the entire record in this case brings it within the established rule as to possession of the stolen property which places upon defendant the onus of explaining said possession. In this connection it is insisted that the evidence furnishes only a basis for surmise, conjecture or suspicion as to the guilt of the defendant. We are unable to accord to the foregoing contention. As we construe the entire testimony adduced upon the trial below, there are too many incriminating facts and circumstances disclosed to justify the sustaining of this insistence. There was positive, direct and undisputed testimony which tended to show the larceny of the property involved. No resort to conjecture, surmise or suspicion as to this. Likewise there is no dispute or conflict upon the question that during the same night of the larceny about 11:30 o'clock two city officers while patrolling, saw two colored men in defendant's garage and the stolen property lying on the ground in or about the garage, and when they returned sometime later said property was stacked in the garage. As to what happened subsequent to this, see the above quoted testimony of witness officer Anderson. Note further therefrom, that about 4:30 a. m. that morning the two officers in question "went to wake him (defendant)

up, and he was already up and had on his clothes when he came to the door," etc. That his sleeping quarters were in close proximity from where the lumber was stacked, the witness stating: "His sleeping quarters was about as far from the place where this lumber and doors was found as it is to the back of this room." It is further disclosed that the defendant at that time told the officers "he didn't know nothing about it being out there." This the defendant maintained throughout the entire trial. The defendant and his wife both testified to the effect that the said alleged thieves of the lumber and doors, Jesse Jackson and Albert Williams, were total strangers to defendant and that defendant at no time had made any trade or agreement with them to bring the stolen property to his place and stack it in his garage. They further testified that on the morning of the 21st, these two "strangers" came to defendant's place of business and demanded payment for the lumber and doors. As to this, Officer Dixon testified: "I am one of the officers of the City of Prichard. We arrested Albert Williams and Jesse Jackson. We arrested them at nine-five on the 21st of March. We arrested them over in Miles Brown's restaurant or honkytonk. These two men were in there and he was there too. He claimed they were there to collect money for those doors. I did not hear any conversation between them. Miles Brown told us they came to collect for those doors and plywood and he pointed them out to us."

On cross examination of the defendant, the Solicitor propounded the following question to him: "Q. You mean to tell the jury these rank strangers came and dumped in your garage, doors and this other material you could use in your building upstairs." To which defendant replied: "No Sir," and stated: "I do not know any reason why they would put that material in my garage. It was a surprise to me when Mr. Anderson and Mr. Lister woke me up and told me the stuff was out there. I don't know if it was the same kind of plywood that was already used by me in my building upstairs or not. I needed a whole lot to complete that work up there. I needed about seventy-five pieces to finish the work. They did not bring twenty of them to me that night. I was not going to pay these men anything for that stuff. It is not a fact that I had entered into an agreement with

them to pay them twenty dollars for eight doors and twenty sheets of plywood, about sixty or seventy dollars worth of material. When the officers found the stuff in the garage and I knew the officers had it, I did not turn turtle and lay it on these two men."

Other testimony of like import adduced upon the trial could be quoted or recited, but we refrain from so doing, being of the opinion that from what has been said a jury question was presented. The trial court properly declined to direct a verdict for the defendant. This court is likewise without authority to substitute itself for the jury who tried this case. The tendencies of the evidence, and inferences to be drawn therefrom, were, as stated, for the jury. They were also empowered to accord such probative force to the testimony of the several witnesses, who testified in this case, as in their judgment was right and proper. The jury, in the discharge of its duty, is called upon to exercise their common sense, observation, and every day experience, and in this case the noted incriminating facts and circumstances developed upon the trial, coupled with such inferences as should be accorded, was sufficient in our opinion and judgment to warrant the jury in returning the verdict rendered and to support and sustain the judgment of conviction pronounced and entered.

Affirmed.